**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA,**
**OCALA DIVISION**

| | |
|---|---|
| NEVILLE C. BROOKS,<br><br>                              Plaintiff,<br><br>v.<br><br>WILLIAM "BILLY" WOODS, in his official capacity as Sheriff of Marion County; Corporal JASON LESTER, in his individual capacity; and JOHN DOE Nos. 1-20, in their individual capacities,<br><br>                              Defendants. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

**INTRODUCTION**

1.      In August 2020, the Marion County Sheriff's Office ("Sheriff's Office" or "Sheriff") illegally detained Plaintiff Neville Christopher Brooks—not for any alleged criminal activity or for any legitimate immigration enforcement concerns, but solely because he was born in Jamaica. Although a federal immigration officer from U.S. Immigration and Customs Enforcement ("ICE") confirmed to multiple Marion County employees that Mr. Brooks was not subject to any immigration detention request, the Sheriff's Office nevertheless continued his detention long after he posted bond and should have been released.

2.      At the time that the Sheriff's Office illegally detained him, Mr. Brooks was a lawful permanent resident of the United States, and he remains in that status today.

3.      The Sheriff's Office and its employees had no authority to hold Mr. Brooks for immigration enforcement purposes. Nor did they have any reason to believe that Mr. Brooks was subject to removal. Indeed, at the time of his arrest, Mr. Brooks was carrying a valid Florida Class A Commercial Driver License, which can only be issued to U.S. citizens and lawfully present noncitizens.

4.      The Sheriff's Office implements a pair of interrelated policies and practices: (1) detaining all persons who were born abroad, regardless of their present nationality or immigration status ("Detention Policy"), and (2) referring them to ICE for removal or other enforcement ("Referral Policy").

5.      There are over 28 million U.S. citizens who were not born in the United States, and millions more individuals, like Mr. Brooks, who were born abroad but are authorized to live in the United States under federal law. In Florida, over 21% of the population is foreign-born, including nearly 2.6 million naturalized U.S. citizens and more than 1.3 million lawful

permanent residents.

6.      Pursuant to the Detention Policy and the Referral Policy, the Sheriff's Office

detains and refers persons in its custody who are not removable and are of no interest to ICE,

including naturalized or other foreign-born U.S. citizens and lawful permanent residents.

7.      Pursuant to those policies, the Sheriff's Office contacted ICE regarding Mr.

Brooks while holding him in custody in August 2020.

8.      The Sheriff's Office has entered into a limited agreement with ICE (the "Warrant

Service Officer agreement" or "WSO agreement"), to serve immigration warrants on individuals

who are in the Sheriff's Office custody. Such administrative warrants generally accompany a

"detainer," which is a request from ICE that the jail hold an individual after the point they would

otherwise be released from criminal custody (such as on bond, for example). The WSO confers

no authority on the Sheriff absent an applicable warrant, as was the case with Mr. Brooks.

9.      In fact, here, ICE specifically told the Sheriff's Office that ICE did not request

Mr. Brooks's detention, stating, "I cannot find anywhere i[n] our system that someone put a

detainer on him." Yet the Sheriff continued to hold Mr. Brooks overnight and did not release him

until the next morning, after an ICE officer told Marion County employees that Mr. Brooks had a

green card and was not deportable.

10.     At the time of his arrest, Mr. Brooks was 57 years old, with high blood pressure

and a body mass index ("BMI") over 30. He therefore faced an elevated risk for serious COVID-

19 complications, and detaining him in overcrowded conditions at the county jail placed him at

unacceptable risk of contracting the disease.

11.     Five days after his release, Mr. Brooks was diagnosed with COVID-19 in an

emergency room.

12. The Sheriff's Office's actions also put Mr. Brooks in grave fear of being removed from the United States, even though he was not, and is not, subject to any removal proceedings.

13. It is well established that local law enforcement like the Sheriff's Office may not hold people for civil immigration enforcement without any request or authorization from ICE— *i.e.*, unilaterally—much less when ICE specifically disclaims any such request, as it did in Mr. Brooks's case. The WSO agreement does not (and could not) change this basic rule. Thus, the WSO agreement provides no legal cover for the Sheriff's Office's detention of Mr. Brooks, nor for its aggressive policies and practices targeting all foreign-born people, regardless of their citizenship and immigration status.

14. The Sheriff's Office's unlawful and unjustified detention of Mr. Brooks deprived him of his liberty and caused him to suffer severe emotional distress, contract COVID-19, incur medical costs, and lose earnings.

15. Federal and state laws enshrine basic principles: No one should be forcibly detained without cause, and no one should be treated differently based solely on where they were born. Mr. Brooks brings this case to vindicate his constitutional right to be free from unreasonable seizure, his constitutional right to equal protection, and his right under Florida common law to be free from false imprisonment.

## JURISDICTION AND VENUE

16. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17. The Court has supplemental jurisdiction over Mr. Brooks's state law claim under 28 U.S.C. § 1367 because the state law claim is part of the same case or controversy.

18. The Court has remedial authority under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

19. Venue is proper in the Middle District of Florida, Ocala Division, because the

Defendant resides in this District and Division, and a substantial portion of the events giving rise to the claims occurred in this District and Division. 28 U.S.C. § 1391(b)(1)–(2); M.D. Fla. Local Rule 1.04(a)–(b).

## PARTIES

20.     Plaintiff Neville Christopher Brooks was born in Jamaica, is a lawful permanent resident of the United States, and resides in Florida.

21.     Defendant William "Billy" Woods is the Sheriff of Marion County. He is the chief law enforcement officer and policymaker for the Marion County Sheriff's Office, which runs the Marion County Jail ("Jail") and adopted the Detention and Referral Policies. The Sheriff's Office is a municipal agency under Florida law. *See Hufford v. Rodgers*, 912 F.2d 1338, 1341 (11th Cir. 1990) (citing Fla. Const., Art. VIII, § 1(d)). Sheriff Woods is sued in his official capacity as a county officer.

22.     Defendant Jason Lester is a Corporal in the Detention Bureau of the Marion County Sheriff's Office. He was serving in that capacity at the time of Mr. Brooks's arrest and detention. He is sued in his individual capacity.

23.     Defendants John Does Nos. 1-20 ("Doe Defendants") are additional Marion County Sheriff's Office employees, whose true names are unknown to Plaintiff at this time. These individuals are responsible and liable for the acts and/or damages alleged in this Complaint, including for their roles in referring Mr. Brooks to ICE and detaining him without probable cause and without any instruction from federal authorities. The Doe Defendants are sued in their individual capacities. Plaintiff will amend this Complaint to allege the Doe Defendants' true names when they have been ascertained.

## BACKGROUND

24.     Mr. Brooks is a 59-year-old lawful permanent resident, who was born in Jamaica and has lived in the United States since September 2017.

25.     Since November 2017, Mr. Brooks has been employed as a Certified Nursing Assistant ("CNA") in Florida. Until January 2022, he lived and worked full-time in the City of Ocala in Marion County, Florida. Mr. Brooks is currently pursuing an associate's degree in nursing from Herzing University in Orlando, Florida, in order to become a registered nurse. Mr. Brooks continues to be employed in Ocala on a part-time basis while studying in Orlando, and he returns to Ocala once per week, if not more, for work and personal reasons.

26.     Mr. Brooks has many close family members in the United States, including two daughters, four sisters, and numerous nieces, nephews, grand-nieces, and grand-nephews. Mr. Brooks's relatives are all U.S. citizens or lawful permanent residents, and several live in Ocala, Florida.

27.     Mr. Brooks has never been convicted of any crime.

### The Initial Arrest of Mr. Brooks

28.     On August 11, 2020, at approximately 11:35 P.M., the Ocala Police Department arrested Mr. Brooks for an alleged battery offense—a misdemeanor which was later dismissed.

29.     The Marion County Sheriff's Office booked Mr. Brooks into the Marion County Jail roughly thirty minutes later, at approximately 12:07 A.M. on August 12, 2020, and later placed him into a holding area.

30.     The Ocala Police Department's arrest affidavit form and the Sheriff's Office's booking form state that Mr. Brooks was born in Jamaica and, incorrectly, that he is a U.S. citizen.

31.     Mr. Brooks never claimed to be a U.S. citizen. Throughout his entire time in the

Sheriff's custody, no officer ever asked Mr. Brooks about his immigration status or his nationality; nor did anyone ask for Mr. Brooks's immigration documents.

32.     At the time of his arrest and booking into the Jail, Mr. Brooks was in possession of a Class A Commercial Driver License issued by the State of Florida.

33.     Under Florida law, only U.S. citizens and noncitizens who have legal authorization to be in the United States may receive a driver license. *See* Fla. Stat. §§ 322.08(c), 322.051(1)(a)(3).

34.     When ICE is interested in an individual held at a state or local jail, ICE will send a detainer (also called an "ICE hold" or "immigration detainer"), requesting that it hold that person for up to an additional 48 hours after there is no longer a legal justification for the person's detention under state law.

35.     ICE may also issue an "administrative warrant" (also called "ICE warrant"), a non-judicial document directing the arrest of an individual for an alleged civil immigration violation. ICE generally will transmit an administrative warrant along with an ICE detainer.

36.     ICE did not issue any detainer or administrative warrant for Mr. Brooks.

37.     At approximately 2:43 A.M. on August 12, 2020, the Sheriff's Office attempted to notify ICE via fax of Mr. Brooks's arrest and ask whether ICE intended to lodge a detainer, but the fax did not successfully transmit.

38.     Later that morning of August 12, 2020, the judge presiding over Mr. Brooks's initial appearance granted bail of $100. The judge set this bail amount, which was lower than typical, because of concern that Mr. Brooks could be exposed to COVID-19 at the Jail if he were not promptly released.

**The Sheriff's Unlawful Re-Arrest and Detention of Mr. Brooks**

39.     Mr. Brooks's family posted bond at approximately 11:41 A.M. on August 12, 2020, the same day that bond was ordered by the court.

40.     Mr. Brooks was entitled to be released from the Sheriff's custody after posting bond.

41.     At approximately 5:36 P.M. that day, over five hours after bond was posted, the Sheriff's Office sent a fax to the agent on duty at ICE's Operations Control Center, asking whether ICE intended to issue a detainer for Mr. Brooks.

42.     ICE did not respond to the Sheriff's fax, and in no way indicated Mr. Brooks should be detained.

43.     Sometime between 5:00 P.M. and 8:00 P.M. that same day, the Sheriff's Office instructed Mr. Brooks to gather his belongings and report to the front desk to complete his bond paperwork for booking out.

44.     However, at the front desk, Defendant John Doe No. 1 stated to Mr. Brooks that he was being held for ICE and sent Mr. Brooks back to the Jail's general population area, where he remained in the Sheriff's custody until the next morning.

45.     ICE never issued a detainer, administrative warrant, or any other request or authorization to the Sheriff to detain Mr. Brooks.

46.     At approximately 8:10 P.M. on August 12, 2020, Defendant Corporal Jason Lester from the Sheriff's Office emailed ICE at an email address which, by county policy, was used to notify ICE that individuals were ready to be picked up: ICEPICKUPS@marionso.com. The email stated: "Please be advised that Inmate Neville Brooks has posted bond and is ready for ICE."

47.     At approximately 9:18 P.M. that night, ICE Deportation Officer Michael Klim

responded to Corporal Lester's email, copying four other employees of the Sheriff's Office. ICE Deportation Officer Klim's email stated that he could not find any record of any ICE detainer pertaining to Mr. Brooks.

48.    Despite receiving notice that Mr. Brooks was not subject to any ICE detainer, the Sheriff's Office, Corporal Lester, and Doe Defendants continued to detain Mr. Brooks overnight.

49.    Doe Defendants Nos. 2-20 are other Sheriff's Office employees who (i) contacted ICE regarding Mr. Brooks between August 11 and 13, 2020, (ii) ordered Mr. Brooks to remain in custody following the satisfaction of his bail conditions, (iii) instructed another Sheriff's Office employee either to directly contact ICE about Mr. Brooks or to continue Mr. Brooks's detention, and/or (iv) were responsible for the release of inmates from the Jail during the period between Mr. Brooks's posting of bond and his actual release from custody.

50.    The next morning, on August 13, 2020, ICE Officer Klim informed the Sheriff's Office, Corporal Lester, and Doe Defendants that Mr. Brooks had a green card and was not deportable.

51.    Mr. Brooks was not released until sometime after 8:22 A.M. on August 13, 2020.

52.    The misdemeanor battery charge was later dropped by prosecutors and dismissed.

53.    Thus, the Sheriff's Office, Corporal Lester, and Doe Defendants detained Mr. Brooks for at least 20 hours after he posted bond and for over 11 hours after receiving confirmation from ICE that Mr. Brooks was not subject to any ICE detention request.

**Mr. Brooks Lost His Personal Liberty and Suffered Emotional Distress as a Result of the Sheriff's Decision to Detain and Refer Him to ICE.**

54.    The Sheriff's detention and referral of Mr. Brooks to ICE without justification caused him severe emotional distress and damages.

55.    Mr. Brooks was especially distressed by the Sheriff's Office's explanation that he

was being held for ICE, which Mr. Brooks understood to mean that he faced possible removal to Jamaica.

56.     Deportation to Jamaica would have jeopardized Mr. Brooks's career as a CNA, destroyed his aspirations for becoming a registered nurse, separated him from his family in the United States, and subjected him to severe social stigma in Jamaica.

57.     Mr. Brooks views nursing not as simply a job but a profession and a personal calling. The work is profoundly meaningful to Mr. Brooks, who sees how much his patients depend on him daily. Mr. Brooks is pursuing a nursing degree in order to become a registered nurse, to provide even greater care to his patients.

58.     In Jamaica, Mr. Brooks would not be able to serve as a CNA or a registered nurse; would not have the same opportunity to develop his profession; and would suffer stigma and discrimination because the work of a nurse is viewed as "women's work," leading male nurses to be looked down upon and limited to undesirable and stigmatizing positions.

59.     Further, in Mr. Brooks's experience, individuals who are deported to Jamaica from the United States are stereotyped as criminals. Such a misperception would have also subjected Mr. Brooks to social stigma and impeded him from pursuing his prior employment.

60.     Mr. Brooks was also devastated at the thought of being separated from his family in the United States. He has a close-knit family of many U.S. citizens and lawful permanent residents, including two adult daughters in Chicago and Orlando, with whom he is in regular contact. Deportation to Jamaica would have felt like he was leaving a piece of himself behind in the United States.

61.     This experience, which still weighs on Mr. Brooks to this day, led him to suffer from recurring depression, sadness, and loneliness in the months after his arrest. He has had to

rely extensively on his family members and his faith to try to regain a sense of normalcy.

62.     Due to the Sheriff's policies of referring and detaining individuals for ICE based solely on their place of birth, Mr. Brooks fears that he will again be wrongfully held for ICE despite being a lawful permanent resident.

63.     Since his arrest in August 2020, Mr. Brooks has tried to avoid being on the road as much as possible, including minimizing trips even for food and other supplies, to avoid the possibility of any contact with the police.

64.     Mr. Brooks avoids certain neighborhoods in Ocala where police officers are particularly likely to stop drivers, and he has even missed meals because he did not want to risk driving to purchase food.

65.     Nevertheless, despite attending classes in Orlando, Mr. Brooks cannot avoid traveling to and around the city of Ocala because his family and doctor are there, and he remains employed in Ocala on a part-time basis.

66.     Despite his precautions and his attempts to minimize contact with the police, Mr. Brooks has been pulled over in Ocala several times, including when he was obeying traffic laws. For instance, he was once singled out, stopped, and accused of speeding, even though he was following the flow of traffic, with vehicles in front, behind, and adjacent to his car driving the same speed. Mr. Brooks did not receive a speeding ticket.

67.     Under Florida state law, even minor traffic violations can be arrestable offenses. *See* Fla. Stat. § 901.15(5).

68.     Mr. Brooks fears that he will again be stopped for a minor traffic infraction despite obeying traffic laws. Based on his prior experiences, he also believes he was and will in the future be profiled as a Black man and is more likely to be arrested in the future as a result of

his race.

69.     Therefore, Mr. Brooks fears that he will be arrested again by the Ocala police, and

that he will be referred and detained for ICE again in the future based on the Sheriff's policies.

**The Sheriff's Exposure of Mr. Brooks to COVID-19 Infection**

70.     By unnecessarily and unlawfully detaining Mr. Brooks in the general population

area of the Jail after he posted bond, and doing so without taking basic COVID-19 precautions,

the Sheriff's Office exposed Mr. Brooks to an exceptionally high risk of contracting COVID-19

and caused him to contract the illness.

71.     Prior to Mr. Brooks's detention at the Marion County Jail, the Centers for Disease

Control and Prevention ("CDC") had already recognized the unique risk of COVID-19

transmission in jails and prisons, and it was well understood that individuals in jails and prisons

face an exceptionally high risk of contracting COVID-19.[1]

72.     By August 2020, courts in Florida had recognized the danger posed to

incarcerated individuals due to jails' and prisons' failure to adequately safeguard the health of

vulnerable individuals against COVID-19. *See, e.g.*, *Gayle v. Meade*, No. 20-CV-21553, 2020

WL 2086482, at *2 (S.D. Fla. Apr. 30, 2020) ("COVID-19 has ravaged every corner of

American society, including jails, prisons, and immigration detention facilities."); *United States*

*v. Bailey*, No. 92-CR-122, 2020 WL 4261403, at *3 n.2 (M.D. Fla. July 24, 2020) (granting

compassionate release based on COVID-19 risks).

73.     On August 12, 2020, after Mr. Brooks's initial court appearance and after his

bond conditions were satisfied, the Sheriff's Office placed him in the Jail's general population

---

[1] Centers for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated July 22, 2020), https://web.archive.org/web/20200731044124/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

area, which was severely overcrowded and much more densely populated compared to the

holding area in which Mr. Brooks was detained overnight prior to his initial court appearance.

74.     The Sheriff's decision to detain Mr. Brooks after he was entitled to release forced

Mr. Brooks to spend the night in the high-risk, overcrowded, general population area.

75.     The general population area held approximately 50 people in double-bunked beds

that were placed side-by-side, within arm's reach. The setup of the beds made it impossible for

Mr. Brooks to maintain a safe distance from others while sleeping, as all beds near him were

fully occupied.

76.     The CDC has found a significant risk of transmission from being within six feet

of one infected individual for 15 minutes. Here, Mr. Brooks was unnecessarily detained with

dozens of individuals in close quarters for at least 12 hours.

77.     Compounding Mr. Brooks's unlawful detention, the Sheriff's Office failed to take

basic precautions that could have mitigated Mr. Brooks's exposure to COVID-19.

78.     On or about August 12, 2020, the Sheriff issued a directive, effective

immediately, *prohibiting* deputies, staff, and visitors from wearing face masks.[2]

79.     During booking, the Sheriff's Office provided Mr. Brooks with a cloth mask that

was discolored, indicating that it had previously been used and not adequately cleaned. The mask

was not a surgical mask or any other type of medical-grade mask.

80.     The Sheriff's Office did not offer Mr. Brooks a COVID-19 test at any point.

81.     Upon information and belief, the Sheriff's Office did not test other individuals for

---

[2] Scott Neuman, *Florida Sheriff Orders Deputies And Staff Not To Wear Face Masks*, Nat'l Pub.
Radio (Aug. 12, 2020), https://www.npr.org/sections/coronavirus-live-
updates/2020/08/12/901756223/florida-sheriff-orders-deputies-and-staff-not-to-wear-face-
masks.

COVID-19 prior to jailing them and did not separate or quarantine detainees based on COVID-19 status, despite CDC guidance recommending such procedures in correctional and detention settings.[3]

82.     Mr. Brooks, as a trained CNA, recognized that the Sheriff's Office failed to take basic steps to prevent disease transmission.

83.     Mr. Brooks concluded that the conditions at the Marion County Jail placed him and other individuals at serious risk of contracting COVID-19.

84.     During the days after his eventual release from the Jail, Mr. Brooks experienced progressively more serious symptoms, including a fever, fatigue, weakness in his limbs, and loss of appetite. Mr. Brooks suffered distress as he worried that he had contracted COVID-19 while in jail.

85.     Mr. Brooks went to a hospital's emergency room for treatment on August 18, 2020.

86.     At the hospital, Mr. Brooks underwent several kinds of testing and was diagnosed with COVID-19 and bilateral pneumonia.

87.     Prior to and after his arrest, Mr. Brooks carefully practiced social distancing, wore a mask, and took other precautions to avoid contracting COVID-19, consistent with his training and profession.

88.     Prior to and around the time of his arrest, none of Mr. Brooks's close contacts—whether family or co-workers—tested positive for COVID-19.

89.     At the time of Mr. Brooks's arrest, regular bi-weekly COVID-19 testing was required for employees at nursing homes in Florida. FLA. ADMIN. CODE ANN. r. 59AER20-5. Mr.

---

[3] *See supra* n. 1.

Brooks had never tested positive for COVID-19 prior to his arrest.

90.     Mr. Brooks incurred significant medical costs as a result of his COVID-19 illness.

91.     After he was released from the hospital, Mr. Brooks isolated himself for approximately two weeks and was unable to work during that period, which resulted in a loss of earnings for Mr. Brooks.

92.     Even after his other COVID-19 symptoms subsided, Mr. Brooks experienced a cough that persisted for months, which required sustained treatment and medication.

93.     Though he eventually recovered, Mr. Brooks experienced serious distress knowing that his age, high blood pressure, and BMI put him at an especially high risk of serious complications or even death.

**The National Origin Referral Policy**

94.     The Sheriff's Office has a written policy and practice of referring individuals in its custody to ICE based solely on their national origin ("Referral Policy").

95.     Under the Referral Policy, the Sheriff has created a procedure that applies exclusively to any "inmate [who] is NOT born in the US or a US territory." The policy attaches an inaccurate label to that group of people: "Foreign National[s]."

96.     That label is inaccurate because millions of foreign-born people are in fact *U.S.* nationals, rather than *foreign* nationals. U.S. nationals include (but are not limited to) over 28 million foreign-born U.S. citizens who either naturalized or were U.S. citizens from birth (for example, the foreign-born children of U.S. citizen parents). In addition, certain persons born in the United States, *e.g.*, the children of diplomats, are not U.S. citizens.

97.     Thus, notwithstanding its reference to "foreign nationals," the Referral Policy actually applies purely based on a person's place of birth, not their citizenship status, immigration status, or nationality. As a result, this policy sweeps in many U.S. citizens.

15

98.     Moreover, vast numbers of people who are in fact foreign-born foreign nationals are allowed to be present in the United States under federal law, and thus foreign birth, even when coupled with foreign citizenship, presents no cause for investigation or suspicion on immigration grounds.

99.     The Referral Policy instructs employees to fax information about such foreign-born individuals to ICE and to email such information to ICE if the fax is unsuccessful.

100.    The Referral Policy applies to all individuals of foreign birth, including U.S. citizens, lawful permanent residents, and other individuals who are allowed to be present in the United States under federal law, even if ICE has not issued any detainer or expressed any prior interest in them. The Referral Policy expressly discriminates based on national origin because it treats similarly-situated individuals differently based on their place of birth.

101.    Pursuant to the Referral Policy, the Sheriff's Office routinely sends information to ICE regarding individuals who are not removable or otherwise of any interest to immigration authorities.

102.    The Sheriff's Office was aware prior to Mr. Brooks's detention that the Referral Policy sweeps in many U.S. citizens and lawful permanent residents because ICE had repeatedly informed the Sheriff's Office that referred individuals were U.S. citizens or permanent residents and therefore not of interest to ICE.

103.    The Sheriff's Office's own records indicate that, even before Mr. Brooks's unlawful detention, at least 80 U.S. citizens and lawful permanent residents have been referred to ICE.

104.    On several occasions, the Sheriff's Office has referred to ICE U.S. citizens born in Puerto Rico and other U.S. territories, as well as other Black and Brown people born in the

United States who the Sheriff's Office perceived to be foreign nationals.

**The Unilateral Detention Policy**

105.     The Sheriff's Office has an unwritten policy, pattern, custom, and practice of unilaterally detaining individuals of foreign birth ("Detention Policy"), including U.S. citizens and lawful permanent residents like Mr. Brooks.

106.     Pursuant to the Detention Policy, individuals of foreign birth are detained for hours or days after they are otherwise due to be released, for the sole purpose of ascertaining whether ICE is interested in pursuing enforcement action against them.

107.     Pursuant to the Detention Policy, the Sheriff's Office continues to detain foreign-born individuals who are entitled to release, even if the individual is a U.S. citizen or lawful permanent resident, despite the fact that ICE has not issued a detainer or otherwise requested their detention.

108.     Pursuant to the Detention Policy, national origin is a determinative factor for detention, causing individuals to be held even when the Sheriff's Office has no reason to believe that they are removable or are otherwise of any interest to immigration authorities.

109.     Apart from Mr. Brooks, the Sheriff's Office has detained multiple other individuals, including U.S. citizens and lawful permanent residents, who were not subject to an ICE detention request.

110.     According to the Sheriff's Office's records, the Sheriff has repeatedly referred U.S. citizens, lawful permanent residents, or other non-removable persons to ICE *after* the Sheriff's Office had determined that the state criminal basis for detaining the relevant individuals had expired and that they should be released from the County's custody. The Sheriff's Office then detained these individuals pending ICE's response, rather than immediately release them.

111.     For instance, on at least one occasion in July 2018, the Sheriff's Office contacted ICE concerning an individual born in the Philippines. ICE never lodged a detainer, administrative warrant, or other request for detention, and informed the Sheriff that the individual was a lawful permanent resident, but the individual was not released until the day after posting bond, long after she should have been released.

112.     Similarly, on at least one occasion in January 2019, the Sheriff's Office contacted ICE concerning an individual born in Vietnam. ICE never lodged a detainer, administrative warrant, or other request for detention, and informed the Sheriff that the individual was a U.S. citizen, but the individual was not released until the day after posting bond, long after he should have been released.

113.     Further, on at least one occasion in July 2020 and again in November 2020, the Sheriff's Office contacted ICE concerning individuals born in Jamaica who had posted bond. ICE never lodged a detainer, administrative warrant, or other request for detention against either individual, and informed the Sheriff that the former was a lawful permanent resident and the latter, a U.S. citizen. These individuals were not released until the day after posting bond, long after they should have been released.

114.     On at least one occasion in February 2021, the Sheriff's Office contacted ICE concerning an individual born in Trinidad. ICE never lodged a detainer, administrative warrant, or other request for detention, and later informed the Sheriff that the individual was a U.S. citizen. As a result of the delay in waiting to hear back from ICE, she was not released until hours after posting bond and after she should have otherwise been released.

115.     On at least one occasion in April 2019, the Sheriff's Office contacted ICE concerning an individual born in Panama who had completed her sentence. ICE never lodged a

detainer, administrative warrant, or other request for detention, and later informed the Sheriff that the individual was a U.S. citizen, but she was not released until hours after she should have otherwise been released.

116.    In these and other instances, the Sheriff referred and detained individuals solely because they were not born in the United States.

117.    The Detention Policy therefore subjects individuals, including U.S. citizens and lawful permanent residents like Mr. Brooks, to detention without any request from ICE and without any probable cause.

**Civil Immigration Arrests by Local Law Enforcement**

118.    Holding a person after they would otherwise be released from criminal custody, as Mr. Brooks was held for purposes of immigration enforcement, constitutes a new seizure, and specifically a new arrest. *Alcocer v. Mills* ("*Alcocer I*"), 906 F.3d 944, 954–55 (11th Cir. 2018).

119.    Such a re-arrest must be supported by probable cause justifying the new seizure.

120.    It is well established that officers cannot arrest a person for civil immigration enforcement when they lack probable cause to believe the person is removable. *Alcocer v. Mills* ("*Alcocer II*"), 800 F. App'x 860, 865 (11th Cir. 2020).

121.    The mere fact of foreign birth does not provide probable cause that an individual is removable.

122.    It is also well established that local law enforcement officials may not conduct a civil immigration arrest unilaterally, *i.e.*, without a request from federal authorities. *Arizona v. United States*, 567 U.S. 387, 410 (2012).

123.    Although ICE may delegate certain immigration enforcement functions to state officers pursuant to a written agreement under 8 U.S.C. § 1357(g), the state officers can only carry out the specified functions under the direction and supervision of federal authorities. In

addition to federal supervision, to come within the scope of an agreement pursuant to § 1357(g), state officers must complete the requisite training and have knowledge of the immigration laws.

124.    Mr. Brooks was not detained pursuant to any agreement with ICE under § 1357(g).

125.    The Sheriff did not and has not entered into a valid cooperation agreement with ICE that would enable the Sheriff to seize individuals who are not subject to an ICE detainer or administrative warrant.

126.    Moreover, ICE did not issue any detainer or administrative warrant for Mr. Brooks.

127.    The Sheriff is a participant in ICE's WSO program, a narrow arrangement that purports to authorize certain of the Sheriff's employees to execute ICE warrants at the Marion County Jail. However, the WSO does not purport to confer any authority on the Sheriff's Office to act in the absence of an ICE warrant.

## COUNTS

### Count 1 - Section 1983 Claim for Violation of the Fourth Amendment: Unconstitutional Seizure

### (Asserted by Plaintiff against Defendant Sheriff Woods in his Official Capacity)

128.    All the foregoing allegations are reincorporated herein.

129.    The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."

130.    At a minimum, local officers effecting a civil immigration arrest must (i) have probable cause that the person is removable *and* (ii) be acting at the request of federal authorities. *See Alcocer I*, 906 F.3d at 954; *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465, 467 (4th Cir. 2013).

131.    The Sheriff's decision to detain Mr. Brooks after he posted bond on August 12, 2020 failed to satisfy either requirement and therefore violated the Fourth Amendment in two independent ways.

132.    First, the Sheriff had no probable cause to detain Mr. Brooks after bond conditions for his alleged state offense were satisfied. The mere fact that Mr. Brooks was born in Jamaica did not constitute probable cause that he was removable.

133.    Second, the Sheriff unilaterally detained Mr. Brooks without any request or instruction from ICE and failed to release him even after ICE indicated that it had no record of a detainer.

134.    In seizing Mr. Brooks, the Sheriff was acting under color of state law.

135.    The Sheriff's Office's Referral Policy and Detention Policy caused the violation of Mr. Brooks's Fourth Amendment rights.

136.    The unlawful detention caused Mr. Brooks to suffer numerous injuries, including loss of liberty, severe emotional distress, exposure to COVID-19, and economic harms.

**Count 2 - Section 1983 Claim for Violation of the Fourth Amendment:**
**Unconstitutional Seizure**

**(Asserted by Plaintiff against Defendant Lester and Doe Defendants in their Individual Capacities)**

137.    All the foregoing allegations are reincorporated herein.

138.    Defendant Lester and Doe Defendants 1-20 violated Mr. Brooks's Fourth Amendment right by seizing him without probable cause of removability and without any instructions from ICE.

139.    It was clearly established at the time of Mr. Brooks's arrest that local officers could not detain a person for removal absent any request from ICE.

140.    It was clearly established at the time of Mr. Brooks's arrest that foreign birth

alone was insufficient to create probable cause of removability.

141.    Despite clearly established law prohibiting detention without probable cause and unilateral civil immigration arrests, Defendant Lester and Doe Defendants 1-20 continued to hold Mr. Brooks, even after ICE stated it had no detainer for him.

142.    In seizing Mr. Brooks, the individual Defendants were acting under color of state law.

143.    The unlawful detention caused Mr. Brooks to suffer numerous injuries, including loss of liberty, severe emotional distress, exposure to COVID-19, and economic harms.

**Count 3 - Section 1983 Claim for Violation of the Equal Protection Clause of the Fourteenth Amendment**

**(Asserted by Plaintiff against Defendant Sheriff Woods in his Official Capacity)**

144.    All the foregoing allegations are reincorporated herein.

145.    Under the Equal Protection Clause, classifications based on nationality or national origin are subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971).

146.    The Sheriff's Office's Referral Policy and Detention Policy treat individuals differently based solely on national origin.

147.    Based on these policies and practices, the Sheriff's Office unnecessarily referred Mr. Brooks to ICE and detained Mr. Brooks, based solely on his place of birth.

148.    These policies and practices are not narrowly tailored to serve a compelling state interest.

149.    In discriminating against Mr. Brooks, the Sheriff was acting under color of state law.

150.    As a result of the Sheriff's unconstitutional policies, Mr. Brooks suffered

numerous injuries, including loss of liberty, severe emotional distress, exposure to COVID-19,

and economic harms.

### Count 4 – False Imprisonment under Florida Law

**(Asserted by Plaintiff against Defendant Sheriff Woods in his Official Capacity and against Defendant Lester and Doe Defendants in their Individual Capacities)**

151.    All the foregoing allegations are reincorporated herein.

152.    Florida law prohibits the unreasonable restraint of a person against their will.

153.    Mr. Brooks was unlawfully detained and deprived of liberty when Defendants

refused to release him following the fulfillment of Mr. Brooks's bond conditions on his local

charge.

154.    Mr. Brooks's arrest was unreasonable and unwarranted under the circumstances.

Defendants had no probable cause to continue detaining Mr. Brooks after state law required his

release.

155.    By re-arresting and further detaining Mr. Brooks against his will, Defendants

committed false imprisonment under Florida law.

156.    The false imprisonment caused Mr. Brooks to suffer numerous injuries, including

loss of liberty, severe emotional distress, exposure to COVID-19, and economic harms.

157.    Pursuant to Fla. Stat. § 768.28(6), Mr. Brooks has provided the requisite

administrative notice of his false imprisonment claim.

### PRAYER FOR RELIEF

Wherefore, Mr. Brooks respectfully requests that this Court enter judgment in his favor

on all counts, and in addition:

A.    Declare that his seizure by Sheriff Woods and Marion County employees violates

Mr. Brooks's rights under the Fourth Amendment of the Constitution;

B.      Declare that the Sheriff's Office's Referral Policy and Detention Policy violate the Fourteenth Amendment of the Constitution as discrimination on the basis of national origin;

C.      Declare that Mr. Brooks's detention and deprivation of liberty by the Sheriff and Marion County employees constitutes false imprisonment under Florida law;

D.      Enjoin the Sheriff's Office from enforcing its policies and practices of referring and detaining all foreign-born individuals for immigration enforcement;

E.      Award Mr. Brooks appropriate compensatory damages;

F.      Award Mr. Brooks appropriate punitive damages;

G.      Award Mr. Brooks appropriate nominal damages;

H.      Award Mr. Brooks reasonable attorney's fees and costs under 42 U.S.C. § 1988; and

I.      Grant any other relief the Court deems just and proper.

Dated: January 20, 2022

Respectfully submitted,

My Khanh Ngo*
Cody Wofsy*
Spencer E. Amdur*
American Civil Liberties Union
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-1198
mngo@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Omar C. Jadwat*
Ming Cheung*
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
mcheung@aclu.org

Paul R. Chavez (FL Bar No. 1021395)
Victoria Mesa-Estrada (FL Bar No. 76569)
Southern Poverty Law Center
PO Box 12463
Miami, FL 33101
Tel: (786) 347-2056
paul.chavez@splcenter.org
victoria.mesa@splcenter.org

*Attorneys for Plaintiff*
*\* Pro hac vice application forthcoming*

/s/ Amien Kacou
Amien Kacou (FL Bar No. 44302)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Tel: (813) 288-8390
akacou@aclufl.org

Katie Blankenship (FL Bar No. 1031234)
Daniel B. Tilley (FL Bar No. 102882)
ACLU Foundation of Florida, Inc.
4343 W. Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2700
kblankenship@aclufl.org
dtilley@aclufl.org

Jack Fernandez (FL Bar No. 843751)
Daniella Sterns (FL Bar No. 124528)
Zuckerman Spaeder LLP
101 E. Kennedy Boulevard, Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
jfernandez@zuckerman.com
dsterns@zuckerman.com

Alyssa Howard*
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
ahoward@zuckerman.com